# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CECELIA TIERNEY,** | **:** | |
| **Plaintiff** | **:** | **CIVIL ACTION NO. 3:17-1048** |
| **v.** | **:** | **JUDGE MANNION** |
| **GEISINGER SYSTEM SERVICES** | **:** | |
| **and GEISINGER WYOMING** | | |
| **VALLEY MEDICAL CENTER,** | **:** | |
| **Defendants** | **:** | |

## MEMORANDUM

Pending before the court, in this age and disability discrimination action filed by plaintiff Cecelia Tierney, is a motion for summary judgment pursuant to Fed.R.Civ.P. 56 filed by defendants Geisinger System Services and Geisinger Wyoming Valley ("Geisinger" or "defendants"), (Doc. 33). Plaintiff, a former gift shop volunteer with defendants, alleges that she was unlawfully denied a paid position with defendants due to her disability and her age. Based upon the court's review of the motion and related materials, the defendants' motion will be **GRANTED** with respect to all of plaintiff's claims since the defendants undisputedly had legitimate non-discriminatory reasons for not hiring plaintiff and there is no genuine issue for trial that the failure of defendants to hire plaintiff was pretext for age and disability discrimination.

1

# I.    BACKGROUND

The plaintiff filed the instant action under the Age Discrimination in Employment Act, ("ADEA"),  29 U.S.C. §621, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq.*, as well as under the Pennsylvania Human Relations Act, ("PHRA"), 43 P.S. §951, *et seq.*[1] Plaintiff also seeks declaratory relief under 28 U.S.C. §§2201, *et seq.*, seeking the court to declare that defendants' alleged practices and policies were discriminatory and in violation of the ADA and ADEA. Further, plaintiff seeks injunctive relief asking the court to enjoin defendants from violating the ADA and ADEA and, directing defendants to immediately appoint her to the gift shop clerk position.

Plaintiff filed her original complaint on June 14, 2017. (Doc. 1). Plaintiff filed an amended complaint on June 19, 2017. (Doc. 3). Specifically, in Count I, plaintiff raises her claim under the ADA alleging that defendants

---

[1]ADEA and PHRA claims are analyzed under the same standard. *See* Colwell v. Rite Aid Corp., 602 F.3d 495, 500 n.3 (3d Cir. 2010). Although the Pennsylvania legislature has failed to enact amendments to the PHRA similar to the ADAAA, "because [plaintiff] is unable to prove that [defendants'] reasons for not hiring her were pretextual under either the motivating or determinative factor test, her ADA and PHRA claims can, and will, be considered together." Bielich v. Johnson & Johnson, Inc., 6 F.Supp.3d 589, 602 (W.D.Pa. 2014) (citations omitted). As such, the court will discuss all of the plaintiff's ADAAA and PHRA claims together.

discriminated against her and did not hire her for the position of gift shop clerk in July 2016 based on her disability, namely a traumatic brain injury. In Count II, plaintiff raises her ADEA claim alleging that she was not hired by defendants due to her age, i.e., 68 years old, and that a substantially younger and less qualified person, Sheila Moore, was hired for the position. In Count III, plaintiff raises her similar state law disability discrimination claim under the PHRA. Finally, in Count IV, plaintiff asserts an age discrimination claim under the PHRA.

After completing discovery, the defendants filed a motion for summary judgment with respect to all of plaintiff's claims, pursuant to Fed. R. Civ. P. 56,[2] on July 15, 2019. (Doc. 33). The motion was then briefed. Also, defendants filed a statement of material facts and plaintiff filed a response, and plaintiff filed a counterstatement of facts and defendants filed a response to it. Further, the parties filed exhibits.

_____

[2]Since both parties state the correct standard of review applicable to a summary judgment motion, the court will not repeat it. Suffice to say that to prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact and, that the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *See* Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

This court's jurisdiction over the plaintiff's federal claims is based on 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. §1337.

## II.    MATERIAL FACTS[3]

### 1. Plaintiff's Disability

The undisputed facts, as supported by the record, establish that the plaintiff, born on November 25, 1947, was involved in a motor vehicle accident on August 19, 2000, and suffered a head trauma and brain injury. As a result of the injury, plaintiff has a major physiological impairment.

At the time of her injury, plaintiff worked as a property researcher for Priority Search in Kingston, Pennsylvania. Her duties included entering completed title reports into the computer system, completing deed research for properties to be sold, and delivering and reviewing reports with the title agency.

Due to her brain injury, plaintiff applied for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA") on October 5, 2000, claiming that she "became unable to work because of my disabling condition

---

[3] The court notes that it only includes relevant material factual statements with support in the record. Legal arguments and conclusions are not included.

on August 19, 2000", and that she was "still disabled." In her application for SSDI, plaintiff also agreed to notify SSA "if my condition improves so that I would be able to work."

Plaintiff's SSDI application was granted by SSA in March 2004, and "[she] has received Social Security disability income since the date of her traumatic brain injury [i.e., her onset disability date of August 19, 2000]" through 2013. In 2013, when plaintiff became 66 years old, her SSDI automatically converted to age retirement Social Security benefits. The amounts of her benefits however remained the same.

During the time she was receiving SSDI, plaintiff submitted periodic disability reports to SSA regarding her condition and her eligibility for continued SSDI. In those reports, including the one she signed on March 25, 2004, plaintiff made the following representations regarding her disability:

(a)     "I do not cook my own meals."

(b)     "I must rest ½ hour between tasks."

(c)     "I can only stand for a while with a cane."

(d)     Her trash was picked up at her door twice per week.

(e)     She had to stop "all physical activities, such as long walks, runs, lifting, pulling, pushing" - stating "I have a hard time walking – stairs are hard. I cannot lift my feet well."

(f)     She claimed to get exhausted after climbing 5 steps.

(g)     "I cannot do anything physical without the need to rest."

(h)     She cannot use knife and fork well due to her impaired left side.

(i)     She cannot fasten buttons.

(j)     "I cannot do small tasks with right hand. I cannot type, do needlework etc."

(k)     "I have difficulty in communications my thoughts or expressing myself."

(l)     "I do get forgetful - I may miss [appointments]. I may get confused with instructions etc."

(m)     "I have trouble with written or oral instructions. I often can get confused."

(n)     She could walk without assistance, but "no more than 300 feet."

(o)     "I find it hard to concentrate and engage in physical activity."

However, plaintiff's abilities subsequently improved with effort and training.

Plaintiff had a driver's license and was able to drive. Plaintiff also used a cane to walk.

In her deposition, plaintiff testified that after she began receiving SSDI from SSA she did not recall ever notifying SSA that her medical condition improved to the point she was able to seek employment. Nor did she ever

tell SSA that she was no longer disabled or that she was better. Further, plaintiff does not dispute that her medical condition has not improved since the date that Social Security granted her SSDI application.

However, after plaintiff began receiving SSDI, she continued working for Priority Search, in a reduced capacity to stay within the income limits allowed for SSDI recipients from 2002 until 2008, when Priority Search closed.

From 2008 through 2012, plaintiff volunteered with her church and provided transportation for people who needed rides to go shopping, for medical appointments, or to eat out.

From 2012 to 2013, plaintiff volunteered with Goodwill Industries.

Also, in 2012, plaintiff applied to the Pennsylvania Office of Vocational Rehabilitation ("OVR"), which is within the Pennsylvania Department of Labor, for assistance. OVR referred plaintiff for a neuropsychological evaluation with Dr. Michael Raymond of the Heinz Rehab Hospital. Dr. Raymond was well qualified and experienced to perform such evaluations since he was the primary neuropsychologist for OVR since 1986 and had performed numerous evaluations for OVR over the years. In fact, after plaintiff's accident, Dr. Raymond evaluated plaintiff in 2001 to determine her

"neurocognitive capabilities" and her "ability to perform certain tasks either in the workplace or in school."

In his 2012 report for OVR after reevaluating plaintiff, Dr. Raymond concluded "[u]nfortunately, given her chronic and rather significant cognitive limitations, it might not be feasible for her to obtain gainful employment."

In his deposition taken in the instant case, Dr. Raymond stated that he compared plaintiff's 2001 evaluation to her 2012 evaluation. Specifically, Dr. Raymond testified that after her August 2000 accident, plaintiff had "no noteworthy or significant interval improvement in her general level of neurocognitive deficiency", and that plaintiff's testing showed "significantly reduced executive functions which coincides with brain damage and the type of brain injury that she had." Dr. Raymond also testified that plaintiff's reduced functions would prevent her from "processing information quickly, abstract reasoning, [and] completing tasks in a timely fashion." The doctor further stated that plaintiff suffered from reduced memory problems with mathematics and computation, and that it "would be somewhat difficult" for plaintiff to accurately count money and to balance and operate a cash register.

8

### 2. Plaintiff's Position with Geisinger's Volunteer Program

On December 10, 2013, plaintiff began working for Geisinger as a volunteer through the Mature Workers Program ("MWP") administered by the Area Agency on Aging for Luzerne-Wyoming Counties. Plaintiff worked for Geisinger as a volunteer through February 2017. Plaintiff volunteered at Geisinger's gift shop in Wilkes-Barre, Pennsylvania. MWP is part of a federally funded program in which individuals, who are paid stipends by the Program, are placed in volunteer positions with Host Agency, such as Geisinger, to gain work experience and skills so that eventually they may be able to get employment which is not subsidized by the Program. The Host Agency provides supervision, training, and a safe worksite for participants/volunteers.

The Host Agency Agreement between Geisinger and Senior Community Services Implement Program of the National Council on Aging (the predecessor to the MWP) provided:

> Host agencies agree to give serious consideration for any permanent job openings in the agency to qualified assigned participants. Failure to consider qualified participants for these job opening[s] could be cause for termination for cause of this agreement with that participant's host agency.

9

In order to participate in the MWP, plaintiff had to sign a certification that she lived in subsidized housing, had a "severe disability", and "severely limited employment prospects."

Barbara Coyle was the Director of Volunteer and Retail Services for Geisinger's South Wilkes-Barre and Geisinger Wyoming Valley hospitals from 2013 to late 2017. Coyle was also System Director of Retail Services responsible for all gift shops within the Geisinger System. Further, Coyle coordinated with the MWP to place plaintiff as a volunteer with Geisinger's gift shop. Along with Coyle, Amanda Billotti were in charge of the volunteers.

During her time as a volunteer with Geisinger, plaintiff worked in the Geisinger South Wilkes-Barre gift shop. Plaintiff's direct supervisor at the gift shop was Linda Jendrzejewski, who served as the Manager of Retail Services for the Geisinger South Wilkes Barre and Geisinger Wyoming Valley from 2012 through the end of 2017. As Manager of the gift shops, Jendrzejewski was responsible for establishing the training and orientation schedule for volunteers, including plaintiff. Coyle was Jendrzejewski's supervisor.

Geisinger had a Volunteer Services Assignment Description that listed the following duties that a volunteer with the gift shops could perform:

(a)    Sign the volunteer register.

(b)     Report to the Forget-Me-Not Gift Shop / GSWB Gift / Resale Shop.

(c)     Volunteer will operate the cash register, keep shelves stocked and merchandise orderly.

(d)     Volunteer will maintain the shop and keep it clean, dusted and well-lit.

(e)     Volunteer will report any condition needing attention to the Manager or the Facilities department.

(f)     Volunteer will obtain change for the cash register when necessary.

(g)     Volunteer will close the register at the end of the day, reconciling register receipts with cash, checks and charge slips in cash drawer.

(h)     Volunteer will lock deposit in the safe or deliver deposit to safe as required.

(i)     Volunteer will check merchandise and know prices.

(j)     Volunteer will adhere to hours scheduled and inform the Manager when absence will occur.

(k)     Volunteer will attempt to obtain substitute from the active volunteer list whenever absence will occur. If substitute is not available shop will close.

(l)     Volunteer will not leave gift shop unattended. If no relief is available, close the shop.

11

(m)   Volunteer will sign out at the volunteer register at the end of the shift.

The above 13 listed requirements for a volunteer were essential functions and Coyle stated that "all of the volunteers were asked to do all of these tasks." However, Jendrzejewski was the only one who performed task (k) above. Plaintiff stated that she performed all of the required duties during the time she volunteered for Geisinger. However, Coyle explained that "the gift shop volunteers may have done one or two or even five of some of these functions, but they were not required to do all of the essential functions during their shift."

A volunteer's duties depended on their ability and willingness, and Geisinger would permit them to decide what responsibilities to take on. In fact, some volunteers were permitted to sit and read a book or help the manager display merchandise if that is what they wanted to do. Some volunteers only had a certain set of assigned duties (e.g., taking care of candy). Other volunteers would simply come in every Tuesday and do inventory for magazines. Sometimes Jendrzejewski would arrange seasonal and unique-themed merchandise displays or new merchandise and simply ask the volunteers for their opinions of the displays, never allowing them to actually do the displays. However, Jendrzejewski stated that the volunteers,

including plaintiff, could perform many of the duties that the paid employees performed.

It is undisputed that Jendrzejewski observed that plaintiff was "handicapped" and that she had "slurred speech", was lame on the right or left side, and walked with a limp. Thus, Jendrzejewski generally did not ask plaintiff to go into the back room and take merchandise and put it out since she knew plaintiff "is handicapped, and I didn't want her to fall", but plaintiff did put stock out.

Plaintiff testified that she did not have trouble performing any tasks she was assigned as a volunteer in the gift shop and that she was capable of collecting payment for merchandise, taking care of the cash register, providing change for customers, opening and lifting boxes, balancing daily sales on the cash report, used the credit card machine, assisted customers, and completing bank deposits. Plaintiff also stated that she reviewed and checked in new merchandise when it arrived, and stocked merchandise that did not require her to get onto a step stool. Jendrzejewski also admitted that plaintiff could perform the stated functions. Further, plaintiff performed her tasks "with a friendly and kind demeanor that made her a refreshing and pleasant person to be around."

Many times, plaintiff stated that she was alone working in the Geisinger gift shop, particularly if someone could not make it to work that day. Plaintiff was also reliable in her attendance and in notifying Geisinger when she could not be at work. Plaintiff was the only person Jendrzejewski could rely on to come to work when called. Sometimes, plaintiff stated she closed the gift shop without assistance and without anyone else present. However, defendants' evidence shows that plaintiff attempted to close the gift shop on occasion but she was not always able to do so by herself. Sometimes plaintiff would get mixed up when counting the money and she could not balance the register out.

Jendrzejewski stated that she did not ask the volunteers, including plaintiff, to do many of the job duties at the South Wilkes-Barre shop and she explained her view of the positions of volunteer as follows:

(a)    "But they were volunteers. It's not like they came into work. They were volunteers. I didn't get enough volunteers to begin with. I wanted this to be a joy to come to work and socialize. That's what I feel they were there for."

(b)    "…they would just sit and greet people coming in. That's what their job was." They "[kept] the gift shops open, [kept] the register going."

14

(c)    "When somebody is being paid, you would think whatever is in the job description, they should be able to perform."

Additionally, when Jendrzejewski interviewed candidates for the Flexible Retail Sales Associate position, ("FRA position"), she had a different view, as compared to a volunteer, about the type of employee that she wanted for the paid position. She stated that when somebody is being paid, they should be able to perform what is in the job description.

### 3. Plaintiff's Performance with Geisinger's Volunteer Program

Even though plaintiff's eligibility to participate in the MWP ended on July 22, 2016, plaintiff continued to work as a volunteer for Geisinger in its gift shop for another seven months until February 2017.

During her time as a volunteer, plaintiff and defendants dispute whether she performed all the above stated duties which could be assigned to volunteers.

Coyle stated that she "might" have observed plaintiff in her volunteer role on a weekly basis when she was "walking through the gift shop," or "in the morning before the shop opened in the lobby on [her] way to work." Nonetheless, Coyle stated that she did in fact personally observe plaintiff while she was volunteering. Coyle also spoke to Jendrzejewski consistently about all of the people who volunteered in the gift shop. During their

15

discussions, Jendrzejewski indicated that plaintiff performed less than adequately as a volunteer. Jendrzejewski stated that sometimes plaintiff properly handled change and money, and sometimes she did not. However, Jendrzejewski never documented that plaintiff had performed less than adequately. Coyle also admitted that plaintiff's file did not have any notations regarding her performance as a volunteer.

Jendrzejewski also advised Coyle that plaintiff could not be left alone to balance the register. Jendrzejewski explained that she observed that plaintiff on occasion had a problem counting change and indicated that "[plaintiff] had a hard time." Jendrzejewski testified that some days plaintiff would correctly balance the register and other days she did not because she would "get mixed up on money at times." At times, plaintiff's inability to balance the daily receipts was due to mistakes other volunteers made in the register, but other times plaintiff's inability to balance the money was due to her lack of skill and inability.

Jendrzejewski also stated that performing bank deposits was not an essential function of a FRA's job, and that Moore, Rish and Brutsche all had difficulty in balancing the day's receipts.

16

According to Coyle, Jendrzejewski indicated that other volunteers were not comfortable being around plaintiff and that they had to support her to a degree that they did not particularly like. However, Jendrzejewski disputed these alleged comments.

Jendrzejewski and Coyle stated that plaintiff was occasionally asked to close the shop, but she had difficulty and required assistance, and she was not always successful. However, on occasion, plaintiff closed the register at the end of the day and reconciled the register receipts with cash, checks and charge slips in cash drawer.

While Coyle's understanding was that plaintiff could not be left alone in the gift shop, Jendrzejewski did leave plaintiff alone to close the gift shop on occasion. Plaintiff also stated that at times she worked alone in the gift shop especially if someone called in and could not make it to work that day.

Jendrzejewski testified that she observed plaintiff "quite a bit" and that she was "limited of what [she] can ask of [plaintiff]", so she really kept her at the register counter during her time as a volunteer.

Jendrzejewski stated that she "helped [plaintiff] much more than [she] helped anybody else" and, that plaintiff had a hard time counting change "if she got frustrated and got a little bit nervous."

17

Coyle allowed Jendrzejewski to manage the situation with plaintiff and, it was her understanding that Jendrzejewski would get someone else to deal with plaintiff's errors or put a different procedure in place so that no one would have to deal with her errors.

### 4. Flex Retail Sales Associate Position with Geisinger

In January 2016, Geisinger posted a job opening for an FRA position in its gift shops. The job opening was for three different positions, one at Geisinger South Wilkes-Barre and two evening positions at Geisinger Wyoming Valley ("Plains").

The written job description for the FRA position specified the "Major Duties and Responsibilities" and indicated that the following duties were "essential functions" of the position:

(a)     Collects payment for merchandise, provides change, balances daily sales on cash report and completes bank deposit.

(b)     Prices and Inventories Merchandise. Processes telephone orders and sales.

(c)     Ensures attractive and inviting environment. Dusts and restocks shelves. Operates vacuum or sweeper. Stores, arranges and displays merchandise.

(d)     Performs clerical tasks: Records orders, invoices, and magazine inventory. Verifies merchandise received against packing slips and

processes invoices as assigned. Inventories, restocks and bundles magazines and/or newspapers for pick-up by vendor.

(e)     Informs management of specific customer requests, comments, and concerns.

(f)     Secures doors and register. Locks money and deposits in safe. Maintains gift shop security to minimize shrinkage and prevent vandalism.

(g)     Courteously informs and directs visitors and patients as needed.

(h)     Assists with inventory management.

(i)     Works cooperatively with other personnel in a team effort to accomplish objectives in accordance with hospital and system policies.

Under "Competencies and Skills" for the FRA position, it stated that the "ability to accurately count money and operate a cash register is required."

A major responsibility of the FRA position was to do the bank deposits, and all employees who held FRA positions had to do bank deposits. In fact, the Job Requisition posting for the FRA positions specifically listed completes bank deposits as an essential function of the position.

Coyle encouraged the volunteers to apply for the FRA positions, including plaintiff. Despite believing that plaintiff was not fully qualified to perform the essential functions of the FRA position, Coyle encouraged plaintiff to apply because she knew plaintiff was looking for a job and she

19

"thought ... that [plaintiff] needed to go through [the] exercise of applying for a job" and being interviewed, which she thought would be a "good learning experience." However, plaintiff indicated that she did not need to go through the job application process since she had already completed 75 job applications from February 2013 through August 2015, via the Area Agency on Aging.

Plaintiff applied for the FRA position on February 18, 2016. At this time, plaintiff was receiving Social Security retirement benefits and not SSDI. Plaintiff stated that during the time she worked as a volunteer, she regularly told Jendrzejewski, that "I want this [the FRA] job", and Jendrzejewski advised Coyle that plaintiff wanted the FRA job.

Nonetheless, plaintiff testified that she could not recall ever applying for a position as an employee with Geisinger, and stated, "I don't recall, but they say I did [apply]." Plaintiff also testified that she never filled out an application of employment to be an employee in the Geisinger gift shop. When plaintiff was shown her on-line job application for the Geisinger FRA position at her deposition, she repeatedly stated that she did not recall ever completing the application.

20

During discovery, defendants identified Coyle and Jendrzejewski as the decision-makers with respect to the failure to select plaintiff for the FRA position. However, in their depositions, Coyle and Jendrzejewski stated that they did not participate in the decision whether to interview plaintiff for a FRA position and nor whether to hire her for employment. Coyle stated that Linda Gingeleskie was the hiring manager.

Jendrzejewski stated that Coyle excluded plaintiff from the list of applicants to be interviewed for the FRA jobs. In fact, plaintiff was never on the list of applicants HR provided to Jendrzejewski for interviews. Jendrzejewski admitted that she was willing to hire plaintiff as an FRA. Coyle stated that she did not have any input with the decision regarding which applicant would be considered during the hiring process for the FRA's and, she denied any role in the hiring process.

On March 21, 2016, Jendrzejewski hired Linda Brutsche for one of the FRA positions to work the evening shift at Geisinger Plains. Brutsche was the first to be hired with respect to the three open FRA positions. Brutsche was hired in order to keep the Geisinger Plains gift shop open in the evenings.

On June 2, 2016, Geisinger offered the second open FRA position to Sheila Moore. Moore was 57 years old and she began working for Geisinger in July of 2016. Moore was hired by Jendrzejewski to work the evening shift at the Geisinger Plains gift shop. Moore did not work at Geisinger South Wilkes-Barre where plaintiff had volunteered. During her employment as an FRA, Moore worked an average of 14 hours a week at a rate of $10 per hour.

Moore testified that the written job description for the FRA position accurately reflected the duties she performed in that position. Also, Moore stated that the FRA position job description's duties were like a summary of what the job duties were. Moore further stated that she had the following additional regular job duties while working the evening shift Geisinger Plains:

(a)   Learning the new inventory system;

(b)   Ordering toiletries on the inventory system when they ran out;

(c)   Keeping a running list of inventory and would go onto the computer with a password to get to the website and order the products;

(d)   Delivering flowers and gifts to patient rooms;

(e)   Operating the shop while, at the same time, make deliveries for flowers and gifts;

(f)   Shutting the shop and locking it to run and deliver the items and come back;

(g)     Dealing with new inventory in a room right behind the gift shop; opening 5 or 6 boxes of inventory at a time, placing it out on the floor or finding a place for it somewhere until the supervisor came in;

(h)     Breaking down the empty inventory boxes;

(i)     Stocking drinks from a pallet into the coolers;

(j)     Making sure balloons and stuffed animals were always in stock because they were a hot seller; and

(k)     Doing more things than the volunteers did.

Moore also stated that working the evening shift "was a different world" from working the day shift since "you didn't have resources" available during the day. For example, she stated that when the registers went down a couple of times, FRA's on the evening shift had to call IT and try to work over the phone to get them fixed. Other than one night, Moore did not work with any other employee since the gift shop was not busy enough to justify two paid employees.

Additionally, when the FRA positions were advertised, Geisinger was in the process of implementing a new software system called "Yellow Dog" for the management of inventory at the Geisinger South Wilkes-Barre and Geisinger Plains gift shops. In April 2016, the implementation of the new

inventory control system was assigned to Jendrzejewski to complete over the course of several months.

The Yellow Dog inventory system was very difficult and was not something that was easy for anyone, and Jendrzejewski needed someone to help her implement the new inventory system. Jendrzejewski stated that she told Coyle she needed someone to help with the new system, and Coyle responded that the FRA's were being hired to help.

Jendrzejewski received a fair number of applicants for the FRA position at Geisinger South Wilkes-Barre and she felt that there was pressure on her to hire someone who could help with the new inventory control system. Indeed, she testified that "I knew my job was on the line if I didn't do this." Jendrzejewski also stated that she "needed someone that was going to go way over the call of whatever that I was going to hire", and that plaintiff was not the right person for the FRA position at Geisinger South Wilkes-Barre.

On August 1, 2016, Jendrzejewski hired Marie Rish for the FRA position at Geisinger South Wilkes-Barre as one of her assistants. Initially, Rish only assisted with some entry job functions and inventory was not one of her job duties. Eventually, Coyle got the FRA's doing inventory and Rish

then assisted Jendrzejewski with implementing the new Yellow Dog inventory control system for the gift shop.

Rish only worked at Geisinger South Wilkes-Barre since the inventory for all of the gift shops only arrived there, and all of the new merchandise had to be opened, inventoried and priced. Jendrzejewski testified that Rish was the correct choice for the FRA position at Geisinger South Wilkes-Barre since "she was way above it…way above her job description and everything else."

### 5. Plaintiff's Application for Flex Retail Sales Associate Position

Jendrzejewski stated that the new FRA's would be required to use the new inventory control system for the gift shops and that plaintiff was unable to handle such a complex computer system. In discussing the new inventory system duties, Jendrzejewski stated that plaintiff could not fit into that role. Jendrzejewski then testified she was only willing to hire plaintiff "if" the inventory system was not a requirement for the FRA position, and if she only had to keep the shops open and not hire someone to help her with the inventory. Coyle eventually told Jendrzejewski that she needed someone to make sure the inventory system works. Jendrzejewski testified "my heart broke for [plaintiff]", and stated that she was very lenient in treating plaintiff "because I wanted to help her, too." Jendrzejewski also testified that she

25

"was absolutely willing to hire [plaintiff], though, if she was going to be– keep the shops open like she was."

In her effort to help plaintiff, Jendrzejewski called Debra Gallagher, a Talent Acquisition Specialist with Geisinger Human Resources Department, about an unnamed volunteer (i.e., plaintiff) who was applying for one of the FRA positions but who was not able to perform "solo" the essential functions of the job.

Despite her efforts to help plaintiff, Jendrzejewski stated that she was "limited of what I can ask of [plaintiff]." Jendrzejewski also told Coyle that "I did not feel that [plaintiff] could fit [the FRA position]", and that plaintiff was not someone that she considered for the position because she needed someone who was able to perform the implementation of the Yellow Dog inventory control system. Jendrzejewski initially had questions regarding the job requirements for the FRA position, but after she spoke with Coyle she understood a requirement for the position involved the new inventory system.

As the volunteer coordinator for the MWP, Coyle knew from her personal observation of plaintiff while volunteering that she was not able to complete the tasks of the FRA job and, that she was not a fully qualified candidate for the position.

26

Further, Coyle had several discussions with Jendrzejewski about plaintiff's application for the FRA position and Jendrzejewski told her that she also did not think plaintiff could perform the job. For example, Jendrzejewski stated that she could ask plaintiff to put stock out, but she could not ask plaintiff to stock shelves because she was fearful that plaintiff would fall due to her poor walking ability and that plaintiff could not lift the boxes required to be opened while stocking the shop. Also since plaintiff used a cane, Jendrzejewski explained "I really wouldn't give her heavy boxes. Of course, she's a little bit tipsy on the way she walks. And I would never have her help me open boxes."

### 6. Plaintiff's Testimony

Pursuant to the terms of the Host Agency Agreement with the MWP, plaintiff's eligibility to work as a subsidized volunteer at Geisinger ended in July 2016. Plaintiff stated that as a volunteer she would take care of the cash register and help people if they were looking for something in the gift shop. She also would check out new merchandise and write down if it was okay.

When her work as a volunteer in Geisinger's gift shop ended, plaintiff testified that she was "surprised", but she understood that "[she] was a volunteer" and that her "time was up" because she was "only helping out."

Plaintiff also testified that she could not remember asking anyone at Geisinger about staying on at the gift shop at the end of her time as a volunteer or about staying longer.

Plaintiff testified that she had numerous physical limitations due to her impairments, such as:

(a)  Requiring a cane to steady herself, but she claims that she did not consistently use a cane.

(b)  Limited use of her left hand which affects her handwriting since she is left handed, but she can still write. Plaintiff can also hold onto things with her left hand and her dexterity was "OK".

(c)  Inability to stock and reach merchandise on higher shelves, but she could stock and reach merchandise if she did not have to use a stool.

(d)  Inability/difficulty opening boxes, but able to open boxes when she was a volunteer.

(e)  Plaintiff said she could lift 5-7 five pounds.

Plaintiff testified that she could perform all of the physical requirements of the volunteer job with Geisinger, except for getting on a step stool. Plaintiff also indicated that she could perform all of the major duties and essential functions of the FRA position pursuant to its job description, including making sure that the money in the cash register matched the items sold during the

28

day. Specifically, plaintiff responded "Yes", without elaboration, when her counsel asked her if she was capable of the following:

> ensuring an attractive and inviting environment in the gift shop, dusting and restocking shelves, operating a vacuum or sweeper, storing, arranging and displaying of merchandise;

> performing clerical tasks, recording orders, invoices and inventories, verifying merchandise received against packing slips, processing invoices as assigned, and inventorying merchandise;

> arranging seasonal and unique themed merchandise displays and assisting in the selection of new merchandise and inventory management;

> informing management of specific customer requests, comments and concerns;

> securing doors and registers, locking money and deposits in the safe, and maintaining gift shop security to prevent vandalism as well as courteously informing and directing visitors and patients as needed;

> and working in cooperation with other personnel.

Plaintiff testified that she does not think that Geisinger discriminated against her on the basis of her age, and stated: "No. I don't think so." "We are all old." However, plaintiff contends that she was referencing the volunteers who worked at Geisinger, indicating that everyone who volunteered there was old.

29

Significantly, plaintiff testified that she does not think that Geisinger denied her an opportunity to work in the gift shop as an employee, and stated, "Denied me, no. I don't recall that happening."

## III.   DISCUSSION

Plaintiff alleges that defendants did not hire her for an FRA position in their gift shop based on her age in violation of the ADEA and based on her known disability in violation of the ADA. Plaintiff also alleges that defendants regarded her as disabled. Plaintiff contends that she was qualified for the FRA position and that she performed all of the essential duties of the position when she was a volunteer for Geisinger.

The defendants argue that they are entitled to summary judgment in this disparate treatment case because the plaintiff has not offered sufficient evidence to prove that their actions in not hiring her were taken because of her age and disability, and that there is no evidence showing that their decision not to hire her was a pretext for discrimination. The defendants also contend that plaintiff is not a qualified individual under the ADEA and the ADA. With respect to both claims, the defendants also state that the plaintiff fails to show that their legitimate reason for not hiring her, i.e., her inability to perform the essential functions of the FRA position, was a pretext for

discrimination. The defendants further contend that while plaintiff claims that she was able to perform all of the tasks of a volunteer and was well qualified for the FRA position, she "has consistently claimed that she is fully disabled; so much so that she applied for and received Social Security Disability Benefits and represented to the Mature Workers Program that she was not physically or mentally capable of engaging in meaningful paid work."

The court will first address whether plaintiff's SSDI claim precludes her ADA claim.

### 1. ADA Claim

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). To establish a prima facie case of disability discrimination under the statute, the plaintiff must show: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Gaul v. Lucent

31

Technologies, 134 F.3d 576, 580 (3d Cir. 1998)). The ADA defines a "disability" with respect to an individual as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §12102(1).

To establish a "disability" under the ADA, plaintiff must prove that she is substantially limited in performing a major life activity. *See* 42 U.S.C. §12102. The ADA Amendments Act of 2008 ("ADAAA") expanded the scope of disability and construed the definition of disability in favor of broad coverage. *See* Kieffer v. CPR Restoration & Cleaning Service, LLC, 200 F.Supp.3d 520, 533-34 n.9 (E.D.Pa. 2016) (court noted that the ADAAA lowered the standard for finding a disability under the ADA).[4] Nonetheless, the ADAAA's definition of "disability" still remains as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. §12102(1). "[M]ajor life activities include, but are not

---

[4]The court notes that the Pennsylvania legislature has failed to enact amendments to the PHRA similar to the ADAAA. Bielich v. Johnson & Johnson, Inc., 6 F.Supp.3d 589 (W.D.Pa. 2014). As such, courts have applied the pre-ADAAA meaning of disability to PHRA claims. *See* Showers v. Endqscopy Ctr. of C. Pennsylvania, LLC, 58 F.Supp.3d 446, 461-62 (M.D. Pa. 2014).

limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). Further, with respect to the "'physical or mental impairment' prong of the definition of a disability, EEOC regulations clarified that 'the determination of whether an impairment substantially limits a major life activity requires an individualized assessment' and 'should require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Riley v. St. Mary Medical Center, 2014 WL 220734729, *2 (E.D.Pa. May 28, 2014) (citations omitted). However, "[n]ot every impairment will constitute a disability" within the meaning of the ADA. Koller v. Riley Riper Hollin & Colagreco, 850 F.Supp. 2d 502, 513 (E.D.Pa. 2012). Under the ADAAA, the qualifying impairment must still create an "important" limitation. *Id.* Further, in order to establish a prima facie case of disability discrimination under the ADAAA, the burden remains on a plaintiff to establish a causal nexus between her disability and the adverse employment action. Jakomas v. City of Pittsburgh, 342 F.Supp.3d 632, 650 (W.D.Pa. 2018).

Defendants argue that plaintiff's claim that she could engage in the work required for an FRA position is contrary to her representations she made in her application to receive SSDI from Social Security. The issue is whether plaintiff's applications for SSDI and for participation in the MWP, as well as her representations that she was not able to engage in work due to her traumatic brain injury and her physical impairments and that she had a severe disability, contradict her current claim that she was qualified for the FRA position and could perform all of the essential functions of the job. Defendants also point out that during her 2019 deposition, "Plaintiff again admitted that her condition has not changed for the purpose of representing full disability to the SSA, stating: 'I wish I was better. But I never said that I was [better]….'"

In a case such as the present one, where plaintiff had previously represented in her application to receive SSDI to the SSA that as of August 19, 2000 she was totally disabled and not able to engage in work, the issue becomes how does plaintiff reconcile her prior representations of total disability to work and her instant claim that she was qualified for the FRA position and was able to perform the essential functions of the job for purposes of her ADA claim. In deciding this issue, the court must apply the

framework set forth in Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999), "which addressed the estoppel effect of SSDI benefits on a claim under the ADA—and [the Third Circuit's] decisions applying the Cleveland framework to analogous claims. Ehnert v. Wash. Penn Plastic Co., Inc., 783 Fed.Appx. 175, 177-78 (3d Cir. 2019) (citing Cleveland, 526 U.S. at 806 (holding an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of earlier representations made for a SSDI total disability claim, but must proffer a sufficient explanation that reconciles the inconsistent statements); Detz v. Greiner Indus., Inc., 346 F.3d 109, 118–21 (3d Cir. 2003) (applying the Cleveland framework)). SSDI provides monetary assistance to disabled individuals and requires proof that an individual is unable to do her previous work and cannot engage in any other gainful employment. 42 U.S.C. §423(d)(2)(A). "The SSA established a five-step procedure in order to evaluate whether an individual is disabled for purposes of receiving SSDI. Ehnert, 783 Fed.Appx. at 177 n. 2 (citing 20 C.F.R. §404.1520).

Thus, as in the Ehnert case, *id.* at 178, "[t]he dispositive issue before us is whether [plaintiff's] statements regarding [her] disability for SSDI purposes should preclude [her] subsequent claim that, for the purposes of

the ADA and the PHRA, [she] was "qualified" for [the FRA] position [] and can thus pursue [her] discrimination action under the ADA and PHRA."

The Third Circuit in Ehnert, *id.*, explained the Cleveland framework as follows:

> "An ADA plaintiff bears the burden of proving that [she] is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of [her] job.'" Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) (quoting 42 U.S.C. §12111(8)). However, a plaintiff's prior sworn assertion in an application for SSDI benefits that [she] is, for example, "'unable to work' will appear to negate an essential element" of [her] ADA case. *See id.*; Gaul, 134 F.3d at 580. When presented with such a situation, the first question we must ask is whether the representations advanced by that plaintiff in [her] SSDI application and [her] ADA claim genuinely conflict. *See* Detz, 346 F.3d at 118. If we find that the representations are "patently inconsistent," we proceed to the second question under Cleveland: whether the plaintiff has adequately reconciled the two positions. *Id.* at 120.

"Ultimately, to defeat summary judgment, a plaintiff's explanation of any contradiction between SSDI and ADA claims must enable a reasonable juror to conclude that, assuming the SSDI claim was in good faith, the plaintiff could still perform the essential functions of the job with or without reasonable accommodation." Molina v. Pocono Med. Center, 2013 WL 4520458, *12 (M.D.Pa. 2013) (citing Cleveland, 526 U.S. at 807). If a plaintiff fails "to advance a reasonable explanation that reconciles [her] two [apparently contradictory] positions", Ehnert, 783 Fed.Appx. at 179, she is judicially

36

estopped from proving a *prima facie* claim of employment discrimination. <u>Molina</u>, 2013 WL 4520458, *12.

In the present case, although the representations made by plaintiff in her SSDI application and her ADA claim "genuinely conflict" and are "patently inconsistent," <u>Ehnert</u>, 783 Fed.Appx. at 178, the court finds that the plaintiff has "adequately reconciled the two positions." *Id.*

No doubt that an SSDI claim and an ADA claim "do not inherently conflict to the point where courts should apply a special negative presumption." <u>Cleveland, 526 U.S. at 802</u>. There are also "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803.

Plaintiff has shown that she worked in a reduced capacity until 2008 after she was receiving SSDI, and that she then performed volunteer work continually thereafter, including her work with Geisinger. In November 2013, when plaintiff became 66 years old, the SSDI converted to Social Security retirement benefits. Thus, when she applied for the FRA position, plaintiff was no longer receiving SSDI. Plaintiff also presented evidence that as a volunteer for Geisinger she was able to perform most of the duties listed for a volunteer, except for using a step stool to re-stock merchandise. Further,

37

plaintiff submitted evidence that when both paid employees and volunteers were working at the gift shop, the volunteers performed all of the duties the paid employees performed.

As such, plaintiff has produced sufficient evidence to convince a reasonable juror that she could still perform the essential functions of her Geisinger volunteer job with reasonable accommodation.

In Molina, 2013 WL 4520458, at *5, this court found that "plaintiff has both stated her case consistently and produced sufficient evidence to convince a reasonable juror that she could still perform the essential functions of her job with reasonable accommodation." As such, the court is not convinced "that plaintiff's SSDI and ADA claims are incompatible such that judicial estoppel applies", and since plaintiff's SSDI claim and ADA claim can co-exist, "summary judgment is not warranted on this basis." *Id.* at *13.

Next, defendants contend that plaintiff is unable to establish a *prima facie* case of disability and age discrimination because she has not established that she was otherwise qualified to perform the essential functions of the FRA job, which is a necessary element for her ADA, ADEA, and PHRA claims.

The court will now discuss the plaintiff's ADA and ADEA claims in the context of the burden-shifting framework set forth in McDonnell Douglas Corp.v. Green, 411 U.S. 792 (1973). Since the court stated the elements of an ADA claim above, it will now state the elements of an ADEA claim before addressing the McDonnell Douglas analysis.

### 2. ADEA CLAIM

Under the ADEA, employers are prohibited from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1). "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." Howell v. Millersville University of Pennsylvania, 283 F.Supp.3d 309, 322 (E.D.Pa. 2017) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78, 129 S.Ct. 2343 (2009)). It is not enough for the plaintiff to show that her age was a factor that motivated the employer's action, rather she must point to evidence that could support an inference that her age had a "determinative influence" on the decision. Gross, 557 U.S. at 176. This burden remains squarely with the plaintiff, who may prove her claims through direct or circumstantial

evidence. *Id.* at 177. Thus, following <u>Gross</u>, to prove a disparate-treatment discrimination claim under the ADEA, "the evidence must be a sufficient basis for a reasonable jury to conclude that age was the determinative, but-for cause of the employee's termination." <u>Palmer v. Britton Industries, Inc</u>., 662 Fed.App'x 147, 151 (3d Cir. 2016); *see also* <u>Terrell v. Main Line Health, Inc.</u>, 320 F.Supp.3d 644, 656 (E.D.Pa. 2018). In the instant case, plaintiff has not presented direct evidence of age discrimination by the defendants.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] without inference or presumption." <u>Terrell</u>, 320 F.Supp.3d at 656 n. 15 (quoting <u>Torre v. Casio, Inc</u>., 42 F.3d 825, 829 (3d Cir. 1994)). Evidence that the employer treated similarly situated employees outside of the plaintiff's protected class is circumstantial evidence of pretext and not direct evidence of discrimination. *See* <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 645 (3d Cr. 1998) (citing <u>Fuentes</u>, 32 F.3d at 765).

As such, plaintiff is proceeding on her ADEA claim based on circumstantial evidence. "Regardless of the method of proof, 'the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action.'" <u>Terrell</u>, 320 F.Supp.3d at 656 (quoting

Gross, 557 U.S. at 177).

### 3. **McDonnell Douglas** Burden-Shifting Framework

The burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to the plaintiff's age and disability discrimination claims under the ADEA, ADA, and the PHRA, in cases, like the instant one, where the plaintiff relies on circumstantial evidence. *See* Gavurnik v. Home Properties, L.P., 227 F.Supp.3d 410, 416 (E.D.Pa. 2017), aff'd. 712 Fed.Appx. 170 (3d Cir. 2017); Williams v. Phil. Hous. Auth. Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (citation omitted); Wells v. Retinovitreous Associates, Ltd., 702 Fed.Appx. 33, 35 (3d Cir. 2017).

In Howell, 283 F.Supp.3d at 323, the court detailed the three-part burden-shifting framework as follows:

> the plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. Kautz v. Met–Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005). If a plaintiff establishes a prima facie case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* (internal citations and quotations omitted). An employer need not prove, however, that the proffered reasons actually motivated the employment decision. *Id.* If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.*

*See also* Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009).

The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Williams, 380 F.3d at 759 n. 3.

"The burden to establish a *prima facie* case is a not an onerous one, but a *prima facie* case can allow a court 'to eliminate the most obvious, lawful reasons for the defendant's action.'" Decker v. Alliant Technologies, LLC, 871 F.Supp.2d 413, 425 (E.D. Pa. 2012) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

Under the ADA, a qualified individual with a disability is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." §12111(8). An employee is a qualified individual if she satisfies the following requirements: (1) "[that she] has the requisite skill, experience, education and other job-related requirements" and (2) "[that] with or without reasonable accommodation, [she] can perform the essential functions of that position." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (citing 29 C.F.R. §1630.2(n)). "[T]he plaintiff bears the burden of

proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified." Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999) (citation omitted).

As the court in Gavurnik, 227 F.Supp. 3d at 417, explained:

"Essential functions" refers to the "fundamental job duties of the employment position," not "the marginal functions of the position." 29 C.F.R. §1630.2(n)(1). A function is essential if "the reason the position exists is to perform that function." §1630.2(n)(2)(i). The relevant regulation looks to evidence of the employer's judgment, written job description, consequences of not performing the function, and current work experience of incumbents to determine if a function is essential. §1630.2(n)(3). "Whether a function is essential is evaluated on a case-by-case basis...." Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).

"To establish a prima facie case of age discrimination, a plaintiff must demonstrate that (1) [she] is forty years of age or older; (2) the defendant took an adverse employment action against [her]; (3) [she] was qualified for the position in question; and (4) [she] was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). "The requirement that a plaintiff establish a prima facie case of

discrimination 'is not intended to be onerous.'" Andersen v. Mack Trucks, Inc., 118 F.Supp.3d 723, 738 (E.D.Pa. 2015) (citation omitted).

Here, the plaintiff's claim of disability discrimination in her amended complaint is based on an actual disability with respect to her traumatic brain injury as well as a "regarded-as" disability. The evidence clearly shows that plaintiff is a disabled person under the ADAAA as well as under the pre-ADAAA standard. The evidence also shows that plaintiff was over the age of 40, that she was not hired to the FRA position, and that younger employees, including Moore, were hired for the three FRA positions.

However, defendants contend that plaintiff has failed to establish a prima facie case of disability and age discrimination since she was not a qualified person for the FRA position. Defendants contend that the plaintiff could not perform the essential functions of the FRA position to work in one of its gift shops. Defendants argue that they are entitled to summary judgment because the plaintiff has not offered sufficient evidence to establish that she was a qualified person for the job. Defendants also contend that plaintiff cannot prove that their decision not to hire her was taken because of her disability and age, and that their evidence shows that they had legitimate reasons not to hire her. Further, defendants argue that the plaintiff fails to

44

show that their legitimate reasons for not hiring her were a pretext for discrimination.

In this case, viewed in a light most favorable to the plaintiff, the court finds that there are issues of material fact as to whether plaintiff was qualified for the FRA position based on the evidence detailed above that was presented in the case. In short, although defendants presented evidence that plaintiff was not able to do some of the essential functions of the FRA position, such as she had trouble counting and reconciling the daily receipts and was not able to do inventories, plaintiff presented sufficient evidence to show that she was capable of performing many duties of the FRA position and that these duties were largely similar to the duties she was able to perform during her years as a volunteer for Geisinger.

Although defendants argue that plaintiff is only relying on her own self-serving testimony that is not supported by the record to show that she could perform the essential duties of the FRA position, the fact remains that Coyle and Jendrzejewski allowed plaintiff to work uninterrupted for almost 3 years as a volunteer, plus an additional 7 months after her volunteer period officially ended, without documenting or notifying her of any deficiencies in her

performance and, many of the duties of the FRA position were similar to the duties plaintiff performed as a volunteer.

Thus, in construing the facts in a light most favorable to the plaintiff, the court finds that plaintiff has established a prima facie case regarding her age and disability discrimination claims under the ADEA and the ADA. *See* Gavurnik, 227 F.Supp. 3d at 418.

Since it is undisputed that the plaintiff has no direct evidence of discrimination, pretext cases under the ADA and ADEA use the familiar *McDonnell Douglas* burden-shifting framework. *See* Willis v. Norristown Area School Dist., 2 F.Supp.3d 597, 604 (E.D.Pa. 2014). Thus, the court turns to the second step of the *McDonnell Douglas* framework. "At the second step of the *McDonnell Douglas* framework, the employer satisfies its 'relatively light' burden of production by introducing evidence which, taken as true, would permit a conclusion that there was a nondiscriminatory reason for its employment decision." Terrell, 320 F.Supp.3d at 657 (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

The issue at this stage of the analysis is not whether plaintiff's performance was in fact substandard, "but whether [her] actual or perceived

[performance] constitutes a legitimate, nondiscriminatory reason for Defendant's decision to terminate Plaintiff." *Id.* at 658. No doubt that poor work performance is a legitimate, nondiscriminatory justification for terminating an employee. *See* Carter v. Mid-Atlantic Healthcare, LLC, 228 F.Supp.3d 495, 505 (E.D. Pa. 2017) ("Courts within this district have routinely accepted evidence of a plaintiff's failure to meet expected performance goals, in addition to poor work performance, as facially legitimate, non-discriminatory reasons for adverse employment decisions.") (citations omitted). Further, the court's role is not to second guess the business judgment of defendants in deciding not to hire plaintiff.

The court finds that defendants have met their burden and presented an abundance of evidence showing that they had legitimate, nondiscriminatory reasons not to hire plaintiff for the FRA position, as specified above, including their belief that plaintiff could not assist with the implementation of the Yellow Dog inventory system, that plaintiff was not able to properly do bank deposits, that plaintiff lacked the ability to do inventory and to close the shop by herself, and that plaintiff had trouble counting and reconciling the cash register. While plaintiff argues that she did not have difficulties with these tasks and that defendants' beliefs were not accurate,

47

"[i]n a discrimination case, the issue before the court is not the fairness of an employer's decision [not to hire] the plaintiff, but whether the record raises an issue of fact as to whether the decision was motivated by discriminatory animus." *See* Andersen, 118 F.Supp. 3d at 747 (citation omitted).

At bottom, the evidence shows that Coyle and Jendrzejewski were dissatisfied with the plaintiff's performance of some of her duties as a volunteer and that they did not believe plaintiff could perform all of the essential functions of an FRA, as detailed above.

As such, the defendants have met their burden by articulating legitimate, nondiscriminatory reasons for not interviewing and hiring the plaintiff for the FRA position.

The Third Circuit in Smith, 589 F.3d at 689, stated that after the plaintiff satisfies the *prima facie* elements,

> the burden of production shifts to the employer to identify a legitimate nondiscriminatory reason for the adverse employment action. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age [and disability] discrimination. At all times, however, the burden of persuasion rests with the plaintiff.

Thus, since defendants have identified multiple legitimate nondiscriminatory reasons for not hiring the plaintiff, "the burden shifts back

48

once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Terrell, 320 F.Supp.3d at 658 (citation omitted). As such, the plaintiff must now prove pretext by either discrediting their proffered reasons for the employment decision or showing that disability and age discrimination was more likely than not the "but for" cause of their actions.

Plaintiff argues that defendants' reasons for not hiring her for the FRA position were a pretext for discrimination based on her age and disability, and that a reasonable factfinder could find that their reasons were "unworthy of credence."

In order to show pretext, "the employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Thus, "[a] plaintiff can show pretext, and so defeat a motion for summary judgment, 'by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a

49

motivating or determinative cause of the adverse employment action.'" Decker, 871 F.Supp.2d at 429. In order to "discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 765. Moreover, "[t]he fact that an employee disagrees with an employer's evaluation of her does not prove pretext." Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds*, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence', and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (internal citations omitted).

The defendants argue that the plaintiff has failed to establish by a preponderance of the evidence that their proffered legitimate, non-discriminatory reasons for not hiring her were pretextual for any discrimination.

Insofar as plaintiff attempts to rely on evidence that Geisinger eliminated its volunteer program in December 2017 and converted all of the volunteer positions to paid FRA positions, including Edna Malloy, Ulma Hosta, Mary Jane Hunter and Ann Marie Emmel, this evidence is not relevant since it relates to a time period that is 18 months after defendants' decision not to hire plaintiff.

At the outset, plaintiff clearly did not abandon her age discrimination claim as defendants assert. However, the court finds that plaintiff has not met her burden by showing that defendants' proffered legitimate, non-discriminatory reasons for not hiring her were a pretext for age discrimination. Plaintiff has not presented any evidence that age discrimination was more likely than not the "but for" cause of their decision not to hire her. Plaintiff contends that other people, who were allegedly younger than her, were hired for the FRA positions. However, plaintiff has not pointed "to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision." Gavurnik, 227 F.Supp. 3d at 418 (citation omitted). Also, there is not sufficient evidence that people not in plaintiff's protected class were treated differently than plaintiff. In her ADEA claim, plaintiff

compared herself to Moore, as one of the younger person hired for a FRA position. Plaintiff stated that she "[had] no idea" what Moore's age was.

Further, Moore was hired by Jendrzejewski to work the evening shift at the Geisinger Plains gift shop. Moore did not work at Geisinger South Wilkes-Barre where plaintiff had volunteered. In fact, there is no evidence that plaintiff's age was a motivating factor or had any impact on the defendants' decision not to hire her. Nor is there evidence that Coyle and Jendrzejewski knew plaintiff's age or that defendants considered plaintiff's age during the hiring process. Plaintiff has failed to show that a reasonable jury could draw an inference of age discrimination based on the evidence presented in this case.

Plaintiff's contentions and evidence regarding her age discrimination claim are based on speculation and conjecture and this type of evidence is not sufficient to overcome a summary judgment motion. *See* Terrell, 320 F.Supp.3d at 660 (court found that plaintiff's own subjective beliefs without providing evidence to support a finding of discrimination were not sufficient to establish a pretext of age discrimination at the summary judgment stage). Since the plaintiff has not demonstrated that the defendant's legitimate, non-discriminatory reasons for her termination were pretextual, the defendant is

entitled to summary judgment as to the plaintiff's age discrimination claims under the ADEA and the PHRA. *See* Carter v. Mid-Atlantic Healthcare, LLC, 228 F.Supp.3d 495, 511-12 (E.D.Pa. 2017).

Defendants also argue that the plaintiff has failed to establish by a preponderance of the evidence that their proffered legitimate, non-discriminatory reasons for not hiring her were pretextual based on her disability. The defendants point out that their evidence shows the duties of an FRA were more stringent than those of a volunteer, and since plaintiff had difficulty with some of the tasks of a volunteer, Coyle and Jendrzejewski believed that she could not perform all of the essential duties of an FRA. Defendants state that the FRA had to work alone, count money, balance the cash register, move and open boxes, stack shelves and manage inventory. They also state how Dr. Raymond's testimony shows that plaintiff "is significantly limited in her cognitive ability" and that she has difficulty with her memory. Defendants point out examples of plaintiff's inability to recall facts during her deposition that show she was not capable of doing the FRA job, including her inability to remember that she even applied for the FRA job.

In reviewing the record, and based on the undisputed evidence, the court finds that plaintiff has failed to establish by a preponderance of the

evidence that defendants' decision not to hire her was motivated by discriminatory animus on the basis of her disability. It is also of no moment that the plaintiff disagrees with the beliefs of Coyle and Jendrzejewski that her performance as a volunteer was substandard and that she lacked the ability to perform some of the tasks of a volunteer since a plaintiff's subjective disagreement with her supervisor's performance evaluations is not evidence of pretext. Billet, 940 F.2d at 825; *see also* Andersen, 118 F.Supp. 3d at 747 ("In a discrimination case, the issue before the court is not the fairness of an employer's decision to terminate the plaintiff, but whether the record raises an issue of fact as to whether the decision was motivated by discriminatory animus.") (citation omitted). Further, even though plaintiff disagrees with Coyle's and Jendrzejewski's assessment of her performance as a volunteer, including their belief that the plaintiff had trouble with some duties and could not perform all of the duties of a volunteer let alone a FRA, this still does not prove pretext. Billet, 940 F.2d at 825; Farzan v. Vanguard Grp., Inc., 582 Fed.Appx. 105, 108 (3d Cir. 2014). Moreover, "where an employer relies on particular criticisms for the adverse employment action, 'the issue is not whether the [] criticisms of [the plaintiff] were substantiated or valid.... [T]he question is whether [the employer] believed those criticisms to be accurate

and actually relied upon them.'" Carter, 228 F.Supp.3d at 506 (citation omitted). *See also* James v. Sutliff Saturn, Inc., 468 Fed.Appx. 118, 121 (3d Cir. 2012) ("[Plaintiff's] unsupported belief that he was fired for discriminatory reasons falls far short of establishing pretext."); Tolan v. Temple Health Sys. Transp. Team, Inc., 2013 WL 706049, at *18 (E.D.Pa. Feb. 26, 2013) ("In the end we are left only with [plaintiff's] subjective belief that she was discriminated against, and that is not enough to survive summary judgment."), *aff'd*, 557 Fed.Appx. 132 (3d Cir. 2014)).

The plaintiff's evidence "would [not] cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence.'" Burton, 707 F.3d at 430. No reasonable jury could find that the reasons for not hiring plaintiff "were a fabrication or that discrimination [due to her disability] was more likely than not the motivating or determinative cause of [not hiring plaintiff]." Willis, 2 F.Supp.3d at 606. As a result, the plaintiff has failed to meet her burden by establishing pretext regarding the ADA claim.

Because the plaintiff has not demonstrated that the defendants' legitimate, non-discriminatory reasons for not hiring her were pretextual, the defendants are entitled to summary judgment as to the plaintiff's disability discrimination claim under the ADA. Since the same standard applies to

plaintiff's disability discrimination under the PHRA in this case, the defendants are also entitled to summary judgment on this state law claim as well. *Id.* at 604 n. 10 ("Courts within this Circuit interpret the ADA and PHRA coextensively.").

## IV.    CONCLUSION

Based on the foregoing reasons, since the plaintiff has not demonstrated that the defendants' legitimate, non-discriminatory reasons for not hiring her for a FRA position were pretextual, the defendants are entitled to summary judgment with respect to the plaintiff's age discrimination claims under the ADEA and the PHRA, and her disability discrimination claims under the ADA and the PHRA. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: October 16, 2020**
17-1048-02

56